COMMONWEALTH *vs.* RICHARD E. PIETRASS.

Dukes County.   April 2, 1984. — August 27, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Arrest. Probable Cause. Search and Seizure,* Exigent circumstances. *Constitutional Law,* Arrest, Search and seizure, Probable cause. *Practice, Criminal,* Voluntariness of statement.

Police lacked exigent circumstances justifying their warrantless entry of an unlocked dwelling house in the nighttime to arrest a suspect on charges of aggravated rape and other violent crimes, where, although they had probable cause to make the arrest, they had no strong reason to believe that the suspect was armed, that he was within the dwelling, or that he would attempt to escape if not immediately apprehended. [897-900]

Where police made an unlawful warrantless entry of a dwelling to arrest a suspect, whom they had probable cause to arrest, the Commonwealth was precluded from using as evidence certain articles of clothing seized at the time of the arrest, and certain other clothing, worn by the suspect at the time of his arrest and later seized. [900]

Where the validity of a search warrant at issue on a defendant's interlocutory appeal from the denial of his pretrial motion to suppress evidence depended upon observations made by police through a window on the inside wall of a porch attached to the house in which the defendant was sleeping, the judge was to make findings on remand to establish whether the porch was part of the curtilage of the house, and, if it was, whether the defendant was rightfully within the house and had any legitimate expectation of privacy there. [900-902]

Where the judge who denied a defendant's pretrial motion to suppress evidence failed to make findings as to the voluntariness of the defendant's statements and his waiver of rights and where, in light of police testimony to the effect that the defendant had been under the influence of alcohol or drugs at the time of his arrest, his waiver could not be considered voluntary as matter of law, the judge was to consider, on remand, the issue of voluntariness and make appropriate findings. [902]

On remand following a defendant's interlocutory appeal from the denial of his pretrial motion to suppress evidence the judge was to make findings, including those suggested by factors identified in *Brown* v. *Illinois,* 422 U. S. 590, 602-604 (1975), to determine whether the taint of an illegal search and seizure by police required suppression of the defendant's postarrest statements and the results of a lineup. [902-903]

INDICTMENTS found and returned in the Superior Court Department on December 3, 1982.

A pretrial motion to suppress evidence was heard by *Morse,* J.

An application for an interlocutory appeal was allowed by *Liacos,* J., in the Supreme Judicial Court for the county of Suffolk and was reported by him.

*Andrew Silverman* (*Thomas J. Herbert* with him) for the defendant.

*Charles A. Morano,* Assistant District Attorney, for the Commonwealth.

LYNCH, J. This is an interlocutory appeal pursuant to Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979), from the denial of the defendant's motion to suppress certain evidence. We remand the case to the Superior Court for further findings.

The defendant was indicted in December, 1982, by the County of Dukes County grand jury for burglary and assault, aggravated rape, indecent assault and battery, unnatural and lascivious acts, and possession of a dangerous weapon. After an evidentiary hearing, a Superior Court judge denied the motion to suppress. The defendant sought leave to appeal this denial. After a hearing, a single justice of this court allowed the defendant's application for leave to appeal and referred the matter to the full court.

The defendant argues that his warrantless arrest was illegal because the police had neither probable cause to arrest him nor probable cause to believe he was inside the house where the arrest took place. He further contends that the warrantless arrest was not justified by exigent circumstances. The defendant also argues that the police conducted a warrantless search of the premises in violation of Federal and State constitutional guarantees.

Based on his assertion that the arrest and search were illegal, the defendant argues that the following evidence should be suppressed: (1) clothing seized at the time of the arrest; (2) clothing worn by the defendant at the time of his arrest and seized at the county jail; (3) statements made by the defendant at his postarrest interrogation at the police station; and (4) the

results of a courthouse lineup held shortly after the crime was committed. He further argues that evidence seized the day after the arrest pursuant to a search warrant should be suppressed because the warrant, stripped of information obtained by virtue of the illegal arrest and search, does not demonstrate probable cause to search. The defendant's final argument is that the Commonwealth failed to prove beyond a reasonable doubt that his postarrest, incriminatory statements were made voluntarily or that his waiver of the privilege against self-incrimination was knowing and voluntary.

The defendant also takes exception to several of the judge's subsidiary findings of fact, claiming that they are clearly erroneous and should be rejected by this court.

The judge found the following facts.[1] About 10:00 P.M. on November 10, 1982, an intruder entered a house on Newton Avenue in Oak Bluffs, Martha's Vineyard. The victim, an elderly retired school teacher, was at home watching television. The intruder, whose face was partially covered by a white cloth held in place by a bandana tied around his head (the victim said he was masked "like Arafat"), forced the victim to engage in oral intercourse and attempted unsuccessfully to force vaginal intercourse. At some point during the attack, the intruder said, "Do you like Edgartown boys?" and, "Fun time is over now." Although the judge did not include it in his findings, a taped conversation between the victim's daughter and the police dispatcher indicates that the intruder was unarmed at the time of the attack.

Officers of the Oak Bluffs police department responded to the victim's call at approximately 10:50 P.M. and she gave them the following description of her assailant. He was a slim, white male, about 140 pounds, five feet, six or seven inches tall. He had dark hair and a dark moustache that was partially covered with black tape. He was wearing a multicolored plaid shirt, dark pants (possibly green) that smelled strongly of oil or kerosene, brown work gloves, and a tan jacket with sheepskin lining.

---

[1] When the defendant argues that a particular finding is erroneous, we shall so indicate. Where necessary, we shall supplement the judges findings of fact with testimony from the suppression hearing.

At approximately the same time, Officer Warren Gosson[2] of the Oak Bluffs police department heard about the attack and heard a description of the intruder and the clothes he was wearing. Gosson concluded that the intruder was the defendant. He was personally acquainted with the defendant's physical appearance and had recently seen him wearing similar clothing. In his testimony he stated that he knew the defendant to be a friend of one Kevin Reth, whom he knew to live in the vicinity of the victim's house. He had also twice placed the defendant in protective custody, once when he was investigating a house break in a nearby area of Oak Bluffs.

While investigating the break-in and attack, the police noticed a trail of footprints in the sand leading away from the victim's house in the direction of the house where the defendant was ultimately found. At trial, Officer Gosson testified that he followed the footprints to the "general area" of that house. As it turned out, when the police came back the next day, they discovered that the tracks continued further down the beach past the house. But when questioned by the judge as to whether they led beyond the house, Gosson testified, "At that time I did not think so."

The victim was shown a photographic array which contained photographs of the defendant and seven other white males.[3] The victim chose the photograph of the defendant as "looking most like her attacker."

Another of the policemen, Officer George Fisher, spoke with a man who indicated that he thought a person fitting the description of the intruder lived several houses down from the victim's house. At trial, the witness testified that he thought the suspect drove a green telephone company van. Officer Fisher testified that neither he nor the witness mentioned the defendant by name.

---

[2] The judge referred throughout his findings to "Officer Carson." The defendant and the Commonwealth agree that the judge was referring to Officer Gosson.

[3] The Commonwealth and the defendant agree that the photographic array contained a total of eight photographs, rather than seven, as the judge found.

At approximately 1 A.M. on November 11, the officers pro-
ceeded to the house they had identified, which had a green
International Scout vehicle parked outside.[4] They had neither
an arrest nor a search warrant.[5] Two officers stood at the back
of the house while two others went around to the front where
there was a screened-in porch that led to the door to the inside.
A witness testified that a double thickness of plastic occluded
the view into the house. The house was dark and quiet. Officers
Fisher and Maciel opened the unlocked door of the porch and
went inside. There were a door and a window on the inside
wall. Using their flashlights, they looked through the window
and saw on a table brown gloves, a white paper towel with
green design, a thermal undershirt, a white cloth, and a tan,
sheepskin jacket.[6] One of the officers knocked on the inside
door and announced loudly, "police." There was no response,
so they pushed open the unlocked door and stepped inside.
Once inside, they heard snoring or heavy breathing through a
partially open bedroom door. They entered the bedroom, turned
on the light, and found the defendant in bed. There was a
shotgun protruding from under the covers. The officers recog-
nized the defendant as the man identified by the victim. The
judge found that, although the word "arrest" was never used,
it was clear that the defendant was under arrest while he was
still in the bedroom. The judge made no findings as to what
happened after the police left the house with the defendant,
but the testimony indicates that the defendant was taken to the

---

[4] The judge found that "[a] vehicle similar to the van previously described
was parked outside" the house.

[5] The judge found that the officers "knew from previous experience that
it would take at least three hours" to obtain either a search or an arrest
warrant. Officer Fisher's testimony was that it would take at least three
hours to obtain a *search* warrant, that he did not know how long it would
take to obtain an arrest warrant.

[6] The judge found that these items were subsequently seized "pursuant
to a warrant." However, the testimony of Officer Fisher was that the items
on the table were seized at the time of the arrest of the defendant, as they
were leaving the house. The jacket was seized at the jail. The Commonwealth
agrees the seizure was not pursuant to a warrant, but argues that it was
incident to the defendant's arrest and based upon the plain view doctrine.

jail, where additional items of clothing were taken from him. He appeared to be under the influence either of drugs or alcohol. He was given Miranda warnings, which he stated he understood. Upon questioning, the defendant denied having assaulted the victim. After the police telephoned an assistant district attorney to discuss whether there was sufficient probable cause to arrest the defendant, he was formally arrested.[7] Later in the morning of November 11, the defendant was placed in a lineup with five other young men. There was no clear identification from this lineup, although the victim narrowed it down to two of the men, one of whom was the defendant. Also on that day, a search warrant was obtained and several more items were seized from the house where the defendant was arrested, among them two rolls of black electrical tape and a tissue or paper towel.

The judge concluded that the police officers "had probable cause to believe that the defendant was only two houses away from [the victim's] house, that he had committed a violent crime against her person, and it was likely that he would escape or engage in similar conduct if they did not act promptly." The judge also found that the police had probable cause to arrest the defendant.

When police enter a dwelling for the purpose of a search or an arrest, ordinarily they must have a warrant.[8] If they do not have a warrant, two conditions must be met for the entry to be valid: They must have probable cause to believe that the defendant committed the crime and there must exist exigent circumstances. In this case, the police had probable cause to arrest the defendant. Probable cause to issue an arrest warrant is information "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an of-

---

[7] Officer Fisher testified that there is always an assistant district attorney on call to give advice on probable cause.

[8] For purposes of the Fourth Amendment, it makes no difference whether the search of a home is for a person or a thing. *Steagald* v. *United States,* 451 U.S. 204, 214 n.7 (1981). See *Commonwealth* v. *Forde,* 367 Mass. 798, 805 (1975) ("The distinction between an entry to search and an entry to arrest is slight").

fense." *Beck* v. *Ohio,* 379 U.S. 89, 91 (1964). The same standard applies to a warrantless arrest. *Julian* v. *Randazzo,* 380 Mass. 391, 395 (1980). The police in this case had ample evidence (Officer Gosson's familiarity with the defendant's physical appearance and knowledge that the defendant had frequented that area of Oak Bluffs, the victim's identification of the defendant from the photographic array and the neighbor's statement that a person fitting the intruder's description lived in the neighborhood) to conclude that it was "more probable than not" that the defendant was the intruder. *Commonwealth* v. *Cruz,* 373 Mass. 676, 685 (1977).[9]

Regardless of the existence of probable cause, however, the Commonwealth has not sustained its burden of demonstrating that exigency was present to justify the police in proceeding without a warrant. "The essence of an exigency is the existence of circumstances known to the police which prevent them from taking the time to obtain a warrant because to do so would thwart . . . the arrest." *Commonwealth* v. *Huffman,* 385 Mass. 122, 126 (1982), quoting Latzer, Police Entries to Arrest — *Payton* v. *New York,* 17 Crim. L. Bull. 156, 163 (1981). This court has analyzed the factors upon which a finding of exigency could be based as follows: "Factors which would have tended to support a finding of exigency include a showing that the crime was one of violence or that the suspect was armed, a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, and a likelihood that the suspect would escape if not apprehended. Additional considerations testing the reasonableness of police conduct are whether

---

[9] We note, but do not address, the difference between probable cause to arrest a suspect and probable cause to believe that the suspect is inside the dwelling where the warrantless search is to be made. When the entry is into the home of a third person, a search warrant is required. *Steagald* v. *United States,* 451 U.S. 204, 216 (1981). See *Government of V.I.* v. *Gereau,* 502 F.2d 914, 928 (3d Cir. 1974) ("Although police have warrants for the arrest of suspects, they may enter premises, at least of third persons, to search for those suspects only in exigent circumstances where the police officers also have probable cause to believe that the suspects may be within"). See generally Donnino & Girese, Exigent Circumstances for a Warrantless Home Arrest, 45 Alb. L. Rev. 90, 102 (1980).

the entry is peaceable and whether the entry is in the nighttime. *Dorman* v. *United States,* 435 F.2d 385, 392-393 (D.C. Cir. 1970)." *Commonwealth* v. *Forde,* 367 Mass. 798, 807 (1975). In addition, police should consider how long it would take to obtain a warrant. See Latzer, *supra* at 165.

Applying the *Forde* test in this case, based on the facts known to the police, a finding of exigent circumstances is not warranted. Although the crime was a violent one, the police believed that the intruder was unarmed. There was probable cause to believe that the defendant was the intruder.[10] On the other hand, there was no strong reason to believe that the suspect was in the dwelling. The facts relied on by the police to connect the defendant to the dwelling all suggested a general area, but did not identify a particular house: footprints leading in the general direction of the dwelling; knowledge that the defendant was a former roommate of Kevin Reth, who was known to live in the vicinity; the statement of the neighbor that he thought somebody answering the description of the intruder lived on Newton Avenue. The only fact that identified this dwelling in particular was the green International Scout vehicle parked in front. This was a slender thread on which to hang a belief that the suspect was inside. See *State* v. *Rubert,* 46 Or. App. 843, 845-847 (1980) (description of a house "on the west side of 113th Street, about halfway between Holgate and Powell . . . [with] a small sports car in the driveway" was too "loose" for police to have probable cause to search the house).[11]

---

[10] We do not undertake to distinguish "clear probable cause" from any other kind of probable cause. In this case, although the evidence was not overwhelming, it was certainly more than a "bare suspicion," *Commonwealth* v. *Cruz,* 373 Mass. 676, 685 (1977), or a hunch.

[11] Once the police had entered the porch and had seen the items of clothing through the window, they did have probable cause to believe that the man they were looking for would be inside. Whether the police were rightfully on the porch is a question of fact, dependent on whether the porch was a part of the "curtilage" of the house entitled to Fourth Amendment protection. *Commonwealth* v. *Thomas,* 358 Mass. 771 (1971). The judge made no findings on this issue. Even if reason to believe that the suspect was in the dwelling were strengthened by these observations from the porch, however, the analysis pursuant to the *Forde* factors does not demonstrate exigency.

Furthermore, the police had no reason to believe that the suspect would escape if not apprehended immediately. This was not a case of "hot pursuit." The house was dark and quiet. There were four officers present at the time. Two stayed at the back of the house, guarding the windows. Two went around to the only entry door. Two or three of the officers could have stayed at the house to prevent escape while another obtained a warrant. They had no particular reason to believe that the defendant was likely to attack someone else. There was no reason to believe that the defendant was likely to destroy any evidence. There was no reason to believe that the defendant was even aware of the officers' presence. *Commonwealth* v. *Huffman*, 385 Mass. 122, 125 (1982). The facts of this case simply do not demonstrate a situation of exigency, as that concept has been developed in the wake of the *Forde* decision. See, e.g., *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 255 (1982); *Commonwealth* v. *Franklin*, 376 Mass. 885, 898 (1978); *Commonwealth* v. *Boswell*, 374 Mass. 263, 270 (1978); *Commonwealth* v. *Moran*, 370 Mass. 10, 12 (1976). Given these facts, the Commonwealth has failed to meet its burden of showing exigency, and the entry and search of the house on Newton Avenue must be held illegal. *Commonwealth* v. *Hall*, 366 Mass. 790, 804 (1975).

Since the warrantless entry of the dwelling was unlawful, the police had no legal justification for being inside and can justify their seizure of the clothes neither on the basis of the "plain view" doctrine nor as a search incident to a lawful arrest. Similarly, the clothing taken from the defendant at the jail must be suppressed as "fruit of the poisonous tree." *Wong Sun* v. *United States*, 371 U.S. 471, 484-488 (1963).

As to the search warrant obtained the next day, the defendant argues that after striking the unlawfully obtained information from the affidavit in support of the search warrant, there is insufficient evidence remaining to establish probable cause to search the dwelling. *Commonwealth* v. *Forde*, 367 Mass. 798, 807 (1975). The information in the affidavit is based on the statements of the victim, the clothing observed from the porch of the dwelling, and the arrest of the defendant. The statements

of the victim do not identify a particular house and all information stemming from the actual arrest of the defendant must be struck. That leaves the observations of the police through the window. Probable cause to search might still be shown on this basis, if the police were rightfully on the porch. See note 11, *supra*. If the porch were one that a visitor would naturally expect to pass through to gain access to the front door, then it would not be part of the "curtilage" entitled to Fourth Amendment protection. *Commonwealth* v. *Simmons, ante* 45, 49 (1984) (driveway impliedly open to public access). *State* v. *Crea,* 305 Minn. 342, 346 (1975) (same). On the other hand, if the porch door were the real front door of the house, the search would begin when the police stepped inside the porch.[12] On the record before us, we cannot determine whether the porch is part of the curtilage of the house or whether, if it is, the defendant had any expectation of privacy therein. Nor is it clear that the defendant was rightfully on the premises. The judge made no findings on these questions. However, as this is an interlocutory appeal, it is open to the judge on remand

---

[12] If the police were rightfully on the porch, it does not matter that they saw the evidence by looking through a window. As long as the officer had a right to be where he was, he had a right to notice whatever was in plain view, even through a window. *Commonwealth* v. *Hason,* 387 Mass. 169, 176 (1982). See *Nordskog* v. *Wainwright,* 546 F.2d 69, 72 (5th Cir. 1977) (police could look through porch with sliding glass door). See also *People* v. *Willard,* 238 Cal. App. 2d 292, 297 (1965) ("looking through a window does not constitute an unreasonable search").

Nor does the fact that the officers used a flashlight affect the legitimacy of their view of the evidence. This court has said that "the use of a flashlight to look into the interior of a car . . . does not amount to a search at all." *Commonwealth* v. *Cavanaugh,* 366 Mass. 277, 281 (1974). Although the search of a house is different from a search of a car, the reasoning of the court in *Marshall* v. *United States,* 422 F.2d 185, 189 (5th Cir. 1970), is appropriate: "The mere use of a flashlight . . . does not magically transmute a non-accusatory visual encounter into a Fourth Amendment search. When the circumstances of a particular case are such that the police officer's observation would not have constituted a search had it occurred in daylight, then the fact that the officer used a flashlight to pierce the nighttime darkness does not transform his observation into a search." See *United States* v. *Wright,* 449 F.2d 1355 (D.C. Cir. 1971) (looking through partially open garage with aid of flashlight does not constitute a search); *People* v. *Wheeler,* 28 Cal. App. 3d 1065 (1972) (same).

to consider these issues further. Some factors which might aid the determination of the first issue are whether there was a doorbell and where it was located, whether the outer door could be locked, whether the porch was furnished like a room in the interior of the house, and whether it was customary for visitors to knock on the inner or outer door.

Finally, the defendant argues that statements made by him at a postarrest interrogation and the results of a courthouse lineup must be suppressed as "fruits of the poisonous tree." With regard to the statements, he also argues that the Commonwealth failed to sustain its burden of proving beyond a reasonable doubt that the statements were made voluntarily, *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982), and that his waiver of the privilege against self-incrimination was knowing and voluntary, *Commonwealth* v. *Day*, 387 Mass. 915, 921 (1983). As to this issue, the motion judge made neither findings of fact nor conclusions of law. There was testimony from one of the officers that the defendant was under the influence of either alcohol or drugs at the time of the arrest. Had the judge made findings on this issue, we would have accepted them absent clear error, but we cannot say, as a matter of law, that the waiver was voluntary. *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 n.1 (1975). On remand, therefore, the motion judge should consider this issue.

Further findings are also necessary to determine the admissibility of the postarrest statements and the results of the lineup. The principle of *Wong Sun* v. *United States, supra,* that evidence indirectly obtained as a result of illegal police conduct is subject to exclusion does not extend to all evidence that would not have been discovered but for that illegal conduct. *Id.* at 487-488. Other factors can serve to break the causal connection between the illegal conduct and the evidence subsequently obtained. Some of these factors were identified in *Brown* v. *Illinois,* 422 U.S. 590, 602-604 (1975), with respect to a confession after an illegal arrest: (1) the Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Commonwealth* v. *Brad-*

*shaw,* 385 Mass. 244, 258 (1982). The judge should consider all of these factors to determine whether the taint of the illegal search and arrest requires the suppression of this additional evidence.

The order denying the defendant's motion to suppress is vacated and the case is remanded to the Superior Court for further findings in accordance with this opinion.

*So ordered.*